IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SEAN KING,                        )
                                  )
            Plaintiff,            )              8:04CV318
                                  )
        v.                        )
                                  )
WEST CORPORATION,                 )        REPORT AND RECOMMENDATION
    A Delaware Corporation,       )
                                  )
                                  )
            Defendant.            )
_____

The plaintiff has filed a claim to recover overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.  The plaintiff alleges that while employed by the defendant, he worked in excess of forty (40) hours per week, but the defendant unlawfully failed to pay him overtime compensation because it improperly classified him as an exempt employee.  Filing 26 (Report of Parties' Planning Conference).

The defendant claims King's job as a "Voices Services Manager" ("VSM") was properly classified as exempt.  It claims that as a VSM, King held a bona fide administrative position which required him to customarily and regularly exercise discretion and independent judgment in performing non-manual office work directly related to the management policies or general business operations of West or its customers.

The plaintiff seeks to bring this action on behalf of himself and other similarly situated persons employed as order specialists, VSMs and Data Services Managers ("DSMs"),[1] for the

_____

[1]VSMs and DSMs were formerly entitled and are sometimes currently referred to collectively as "order specialists," or separately as "data global service managers" and "voice global service managers."  Filing 155, Ex. A (Trogdon deposition) at 50-

defendant.  Filing 1 (Complaint).  The defendant claims that King
is not similarly situated to all VSMs and DSMs employed by West.
The defendant argues that the level of responsibility and
discretion exercised by a specific VSM or DSM employee, and
therefore that employee's status as exempt or nonexempt, must be
assessed on a case-by-case basis and is dependant on factors such
as the client served, the supervisor's expectations, the team
assignment and structure, and the employee's level of experience.

Pending before me are two interrelated motions:

1.   The plaintiff's Motion for Limited Decertification and
Transfer, and Motion for Bifurcation of Trial and
Request for Oral Argument, filing 131, and

2.   The defendant's Motion to Reject Certification of
Collective Action and Request for Oral Argument, filing
135.

The plaintiff moves to have the class of all VSMs and DSMs
certified as a collective action, but divided into an Omaha
subclass and an Oklahoma City subclass for the purpose of
litigation.  With respect to the trial afforded the Omaha
subclass, the plaintiff further moves to bifurcate the liability
issues from the damage claims.  The defendant moves to reject
certification of the proposed class of all West VSMs and DSMs.

In evaluating these motions, the threshold question before
me is whether King and the VSMs and DSMs working for West are
similarly situated such that they may be considered members of a
class for the purpose of pursuing compensation for unpaid
overtime under the FLSA.  For the reasons discussed herein, I

---

52; filing 155, Ex. B (Hineline deposition) at p. 32.  Separate
job descriptions for VSMs and DSMs were created in 2000.  Filing
155, Ex. A (Trogdon deposition) at 54-55.

conclude the proposed class of West DSMs and VSMs should not be certified.  Having reached that conclusion, I further conclude the plaintiff's motion to divide the class into Omaha and Oklahoma City subclasses should be denied as moot, and as to the plaintiff's request to bifurcate, in the absence of a class, I find there is no justification for conducting two trials on the plaintiff's case.

<u>FACTUAL FINDINGS</u>

The parties have submitted portions of twenty-three depositions,[2] numerous written discovery responses, copies of

---

[2]Other than the deposition of Douglas McConnaughhay, (filing 155, Ex. G), all depositions submitted were of either:
--   West management personnel, see filing 155,
- Ex. A (Trogdon deposition);
- Ex. B (Hineline deposition);
- Ex. C (Schramm deposition);
- Ex. D (Schramm deposition);
- Ex. E (Archer deposition); and
- Ex. F (Hollis deposition), or
--   West employees who have opted into this lawsuit:  Compare filing 137, Ex. 1 (Springer affidavit) ¶¶ 5-9 and Ex. B, to:
Filing 137,
- Ex. 20 (Tuckson deposition);
- Ex. 23 (Kyhn deposition); and
Filing 155,
- Ex. I (Edward Hendershott deposition);
- Ex. J (Thompson deposition);
- Ex. K (Parks deposition);
- Ex. L (Mollman deposition);
- Ex. M (Kosloski deposition);
- Ex. N (Allyson Hendershott deposition);
- Ex. O (King deposition);
- Ex. P (Burns deposition);
- Ex. Q (Kowalke deposition);
- Ex. R (Palmer deposition); *(Note: due to a court reporter error, the text page header identifies the witness as "Stephanie Thompson").*
- Ex. S (Schwarz deposition);
- Ex. T (Richardson deposition);

corporate procedures and job descriptions, copies of employee evaluations, and fourteen affidavits[3] for the court's consideration of the pending certification motions.  The evidence relevant to the certification issue can be summarized as follows:

<u>The Defendant</u>.

West Corporation is a subcontractor of AT&T and, on behalf of AT&T and its customers, provides "interactive voice response services" regarding work orders for changing, installing, modifying, or disconnecting AT&T's communications services. Filing 154 (Lukas affidavit–December 14, 2005), ex. 20 (Contract between West Interactive Corporation and AT&T Corporation) at p.1 ¶ I; filing 155, Ex. G (McConnaughhay deposition) at 37.  VSMs employed by West work on orders to install AT&T voice (telephone) services for AT&T's customers; DSMs work on orders to install equipment for data (computer line) transmission.  Filing 155, Ex. G (McConnaughhay deposition) at 37.

West employs approximately 500 VSMs and DSMs in Oklahoma City and Omaha, all of whom were classified as exempt and paid a salary and no overtime.  Filing 155, Ex. B (Hineline deposition) at p. 29.  Of those 500 employees, 177 have signed consents opting into this lawsuit; 103 are from West's Oklahoma City facility and 74 are from its Omaha location.  Filing 132-2 (Lukas

---

    • Ex. U (Portwood deposition); and
    • Ex. V (Castro deposition).

[3]Other than the affidavits of counsel, all affidavits were submitted by West management personnel save one; that being the affidavit of Jeff Johnson, filing 137, Ex. 13, an Oklahoma City DSM assigned to a retail Frame Relay group.  Mr. Johnson has not opted into the proposed plaintiff class.

affidavit– November 22, 2005) at ¶ 6.  See also filing 137, Ex. 1
(Springer affidavit), ¶¶ 5-9 and ex. B (summary listing 177 opt-
in plaintiffs and their individual claims for overtime pay).[4]
filing 156 (Lukas affidavit--December 14, 2005), ex. W (answers
to interrogatories for each consenting putative plaintiff, 177 in
total, regarding his or her damage claim and calculations).

### The Named Plaintiff

     The plaintiff, Sean King, was a VSM at West's Oklahoma City
location from January 200 until May 24, 2004.  Filing 1,
(complaint) ¶ 2; Filing 155, Ex. O (King deposition) at p. 49,
67.

### VSM and DSM Job Descriptions

     VSMs and DSMs have separate job descriptions, (filing 132,
Exs. D & E), not because their primary job tasks are
substantially different, but because the array of voice services
available through AT&T is more complex, the time required for
installing these services is longer, and more problems arise in
implementing voice orders.  Filing 155, Ex. E (Archer deposition)
at 59-60.  Accordingly, the VSM job description includes all the
responsibilities of a DSM, and further requires VSMs to:  1)
"maintain a thorough understanding of complex advanced features
and ordering processes for these features in order to provide
seamless and efficient service to the client;" 2) "audit team

---

     [4]Filing 156 (Lukas affidavit--December 14, 2005), ex. W
includes the answers to defendant's interrogatories for each of
105 opt-in plaintiffs.  These answers provide information
regarding that plaintiff's damage claim and calculations, but do
not state whether he or she was a DSM or a VSM, nor to which team
the plaintiff was assigned.

members' orders for quality assurance purposes, and mentor new team members;" 3) "proactively maintain an understanding of escalation processes established for each step of order life cycle, ensuring it is followed when needed;" and 4) "participate in additional and on-going training of systems and procedures ensuring incorporation into order life cycle." Filing 132, Exs. D & E. VSM job applicants must have two years of customer service and business experience; DSM applicants need only one year of such experience. Filing 132, Exs. D & E. The VSM and DSM job descriptions and hiring criteria apply system-wide. Filing 155, Ex. A (Trogdon deposition) at 53, 77.

<u>General Description of VSM and DSM Job Duties</u>

The plaintiff, a VSM, seeks to represent both VSMs and DSMs. Accordingly, the discovery in this case, and the submission to this court for class certification, encompasses the job responsibilities of both VSMs and DSMs. The following generally describes their job functions. Only a general description can be provided because not all VSMs and DSMs perform exactly the same job. As further discussed below, some VSMs and DSMs are members of specialized teams that do not take orders, e.g. UMIU specialists, and depending on the assigned team, some perform only a portion of the general duties regarding completion of an order; e.g. "order takers" and "order trackers." Moreover, different procedures may be required for wholesale as opposed to retail or local business orders.[5]

---

[5]For example, VSMs and DSMs handling wholesale orders do not have contact with the end user customer or follow touchpoints (defined hereafter). These VSMs and DSMs communicate with the wholesale clients (e.g. AT&T Wireless or Verizon) and AT&T representatives. Cutovers (defined hereafter) are not performed for wholesale private line customers. Filing 137, Ex. 23 (Kyhn deposition) at 34-45.

However, generally speaking, VSMs and DSMs act as liaisons between AT&T and its voice and data service customers. Filing 137, Ex. 5 (Taylor affidavit) ¶ 4; Ex. 6 (Zweifel affidavit) ¶ 5; Ex. 7 (Davidson affidavit ¶ 3; Ex. 19 (Castro deposition) at 20, 44; filing 155, Ex. V (Castro deposition) at 45. They are the public face of AT&T to its customers and are expected to be competent and knowledgeable about the products, services, and customers of AT&T with which they are working. Filing 137, Ex. 5 (Taylor affidavit) ¶¶ 22, 25; Ex. 6 (Zweifel affidavit) ¶¶ 36, 39; Ex. 7 (Davidson affidavit) ¶ 15; Filing 155, Ex. T (Richardson deposition) at p. 42.

In general, VSMs and DSMs receive preliminary orders, (a MDS or "minimal data set;" filing 155, Ex. C (Schramm deposition) at p. 26), for services from AT&T's sales teams stating what AT&T's customer has ordered. Some of these orders are simple; others are complex. When the sales order is received, the VSMs and DSMs "scrub" the order by looking through the system and making sure that the client identification data is entered correctly. They also review the customer's inventory and technical infrastructure to determine whether the order can be accommodated. Filing 137, Ex. 23 (Kyhn deposition) at 65; Filing 155, Ex. A (Trogdon deposition) at 58-61; Ex. O (King deposition) at 67-68, 71. For example, if a customer had an existing service and wanted changes, the DSM or VSM can access AT&T's databases to determine if additional lines or trunks are needed to accommodate the requested change and provide that information to AT&T sales personnel who would then contact the customer. Filing 137, Ex. 22 (Allyson Hendershott deposition) at 24-25.

7

Depending on the type of client/service team they are assigned to, VSMs and DSMs may then coordinate a discussion between themselves, the customer, and an AT&T technician or IFE (field engineer) to gather information and afford the AT&T technician or engineer an opportunity to determine whether, based on the customer's stated expectations, the customer has ordered the correct service. AT&T personnel provide specific information to the DSM or VSM concerning the equipment needed to correctly place the order into a computer system. This computer entry serves to apprise AT&T personnel of pending projects for service installations, changes, or modifications. Filing 155, Ex. C (Schramm deposition) at p. 27-28, 50; Ex. N (Allyson Hendershott deposition) at 64, 110; Ex. O (King deposition) at 67-68, 71; Ex. P (Burns deposition) at 16; Ex. Q (Kowalke deposition) at 85; Ex. S (Schwarz deposition) at 7-8; Ex. T (Richardson deposition) at 17-23.

Once the order is in the system, AT&T technicians, engineers, and provisioning personnel are responsible for completing the actual work ordered. Filing 155, Ex. C (Schramm deposition) at p. 34; Ex. N (Allyson Hendershott deposition) at 31-32. However, when the service order is placed into the computer, a Service Order Tracking System ("SOTS") program generates a trail of target due dates for each specific step necessary for completion of the order. Filing 155, Ex. C (Schramm deposition) at p. 35, 61; Ex. N (Allyson Hendershott deposition) at 78-79, 110-111. Using the SOTS deadlines and detailed procedures, referred to as "touchpoints" (filing 155, Ex. C (Schramm deposition) at p. 27), the DSM or VSM tracks the order through the system to monitor the "big picture" of its life cycle (from receipt of the order to billing the completed work; Filing 155, Ex. C (Schramm deposition) at p. 8), and is

8

responsible for specifically noting and responding to deadline
problems or delays that could impact the project's timely
completion, and maintaining regular and timely contact with
AT&T's customers concerning how the service order is progressing,
any possible problems, and when the customer should expect and be
prepared for completion.  VSMs and DSMs are responsible and
accountable for coordinating and monitoring the entire life cycle
of voice and data service orders.  Filing 137, Ex. 19 (Castro
deposition) at 20, 25-26; Ex. 20 (Tuckson deposition) at 16; Ex.
22 (Allyson Hendershott deposition) at 23; filing 155, Ex. N
(Allyson Hendershott deposition) at 83; Ex. O (King deposition)
at 67-68; Ex. T (Richardson deposition) at 17-23, 37, 73.

    When complex projects are near completion, the VSM or DSM
coordinates the "cutover;" that is, a conference call process
wherein AT&T's customer and its technician or vendor are on the
phone with AT&T's technician to disconnect any prior service,
connect to AT&T, and test the new service to mutually confirm
that it is working properly, as ordered, and as expected.
Depending on their team assignment or the type of service, VSMs
or DSMs may participate in this conference call, may be present
on the line but not participate, or may connect the call only but
not stay on the line.  Filing 155, Ex. J (Thompson deposition) at
p. 8-9; Ex. L (Mollman deposition) at 40-41; Ex. N (Allyson
Hendershott deposition) at 32-33; Ex. P (Burns deposition) at 26;
Ex. S (Schwarz deposition) at 39-40; Ex. V (Castro deposition) at
45, 78-79.

    Once the field work for the service order is complete and
the service is working properly, the VSM or DSM assures that all
information regarding the work performed on the project is
"BARDed;" that is, correctly entered into the system so that the

9

customer is accurately billed.  Filing 155, Ex. L (Mollman deposition) at 43-44; Ex. O (King deposition) at 68; Ex. S (Schwarz deposition) at 38.

Throughout the order's life cycle, VSMs and DSMs document communications made, and may participate in conference calls and maintain spreadsheets regarding the progress of orders.  Filing 137, Ex. 8 (Ritonya affidavit) ¶ 9.  For some DSMs and VSMs, eighty percent of their day is spent performing data entry. Filing 155, Ex. S (Schwarz deposition) at 9-10; Ex. U (Portwood deposition) at p. 11.  For others, data entry comprises fifty percent of their workload, the remainder being spent monitoring the progress of orders through the system and complying with touchpoint requirements.  Filing 155, Ex. O (King deposition) at 68.  But see Filing 155, Ex. O (King deposition) at 49 (eighty percent of the job was data entry).

### VSM and DSM Teams

VSMs and DSMs conduct their duties as part of numerous specialized teams assigned to manage specific types of customers and types of AT&T services.  There are also groups of VSMs and DSMs that handle highly specialized orders for AT&T clients. Filing 137, Ex. 5 (Taylor affidavit) ¶ 29; Ex. 6 (Zweifel affidavit) ¶¶ 6, 43; Ex. 7 (Davidson affidavit ¶ 4).  The following summarizes the groups/teams working in Oklahoma City and/or Omaha.

A.    VSM Groups/Teams.

VSMs working in Omaha are divided into three types of teams: ABS teams and ABN teams servicing retail clients, and SPM teams

servicing wholesale clients.  Filing 137, Ex. 6 (Zweifel affidavit) ¶ 7.  While VSMs working in Oklahoma City do not service wholesale clients, Oklahoma City has an ABS and an ABN voice retail service group.  Filing 137, Ex. 5 (Taylor affidavit) ¶ 7; Ex. 7 (Davidson affidavit) ¶ 5.

1.   Voice Retail Service Group--ABS Teams.

Omaha and Oklahoma City VSMs in the ABS group service AT&T's largest accounts, such as Cigna, Marriott, Hilton, Home Depot, and United Healthcare.  These teams are composed of multiple VSMs dedicated to serve a specific AT&T customer.  Filing 137, Ex. 5 (Taylor affidavit) ¶ 10; Ex. 6 (Zweifel affidavit) ¶ 9; Ex. 7 (Davidson affidavit) ¶ 6.  Omaha VSMs in the ABS group are further divided into teams that:  1) manage connectivity issues, 2) handle Advanced Features orders, and 2) process Billing Migration orders for retail clients, with each team supervised by a different Area Manager who determines how to organize and supervise the VSMs within the team.  Filing 137, Ex. 6 (Zweifel affidavit) ¶ 11.

- VSM teams assigned to manage connectivity coordinate with AT&T sales, provisioning, and engineering departments, and with representatives for AT&T's client to ensure that proper lines and circuits (T1 and T45 lines) are ordered and installed at the proper location and time so that AT&T's customer receives access to long distance services as ordered.  Filing 137, Ex. 6 (Zweifel affidavit) ¶ 13; Ex. 7 (Davidson affidavit) ¶ 8; Ex. 23 (Kyhn deposition) at 63.

- Advanced Features "ride" on the T1 and T45 lines.  Such features include toll-free numbers (and the mechanisms to forward such calls to another exchange when the initial line is unavailable), call waiting and forwarding, conference services, and many other specialized phone services.  The VSM assigned to Advanced Features coordinates with AT&T and its client

11

to ensure that the services requested are available, are compatible with the lines, circuits, and technology in place the site, are directed to the correct locations, and are operational at the requested time and place. Filing 137, Ex. 6 (Zweifel affidavit) ¶ 14; Ex. 7 (Davidson affidavit) ¶ 9; Ex. 20 (Tuckson deposition) at 18; Ex. 23 (Kyhn deposition) at 63.

- The Billing Migration team manages Cap-N Transfers, large scale transfers of billing information and services for large AT&T customers which occur when, for example, an AT&T client merges with or acquires another company. This position requires the VSM team and its members to ensure that services and charges to the former entity were disconnected, and services reconnected for the new or acquiring entity before services changes are made or new services added. Filing 137, Ex. 5 (Taylor affidavit) ¶ 29   Ex. 6 (Zweifel affidavit) ¶ 15.

2.   Voice Retail Service Group--ABN Teams.

Omaha and Oklahoma City VSMs in the ABN group service smaller AT&T clients, and since the order volume is lower, the orders for ABN teams generally arise from a pool of clients. In some instances, a single VSM works on several client accounts. Filing 137, Ex. 5 (Taylor affidavit) ¶ 10; Ex. 6 (Zweifel affidavit) ¶ 10; Ex. 7 (Davidson affidavit) ¶ 7. As with the ABS teams, Omaha VSMs in the ABN group are further divided into subgroups: 1) teams that manage connectivity issues, and 2) teams that handle "Billing Rejects." Each team is supervised by a different Area Manager who determines how to organize and supervise the VSMs within the team. Filing 137, Ex. 6 (Zweifel affidavit) ¶ 12.

- Teams managing connectivity for the ABN group have the same responsibilities as those performing this function for the ANS group.

12

- The Billing Rejects team researches the possible causes of billing errors or changes, identifies the root cause, and coordinates with the VSM who placed the original order to correct the problem.  If the problem arose due to a VSM error, the Billing Rejects VSM is expected to coach the VSM who placed the order concerning how to avoid the problem in the future and, if it is a recurring problem, advise management with suggestions for further training to avoid future problems.  Filing 137, Ex. 6 (Zweifel affidavit) ¶¶ 16-17.

3.   Voice Wholesale Service Group--SPM teams (Omaha only).

VSMs in the SPM group are divided into several teams, each supervised by a different area manager, and service AT&T's wholesale clients; that is, clients like IBM, Cingular, Verizon, and AT&T Wireless which purchase large amounts of access to AT&T's network and, in turn, sell that access to end user (third party) customers.  VSMs in the SPM teams manage both connectivity and advanced feature orders.  Filing 137, Ex. 6 (Zweifel affidavit) ¶¶ 18.

B.   <u>DSM Groups/Teams</u>.

DSMs working in Omaha are divided into seven types of teams: Private Line teams and Frame Relay teams servicing retail clients; Private Line teams and Frame Relay teams servicing wholesale clients; and Prime teams, UNEP teams, and Mac-D teams servicing local clients.  Local Group DSMs in Omaha work on accounts and services for business clients using AT&T local phone service.  Each team is managed by a different area manager.  Filing 137, Ex. 6 (Zweifel affidavit) ¶¶ 8, 19, and 22.  While DSMs working in Oklahoma City do not service wholesale or local clients, they do perform work in Private Line and Frame Relay

13

groups servicing retail clients.   Filing 137, Ex. 5 (Taylor affidavit) ¶ 8.

> 1.   Data Private Line group:  Retail Clients (Oklahoma City and Omaha) and Wholesale Clients (Omaha only).

Private line teams handle orders requiring multi-point connectivity for data transmission; that is, the technical framework for receiving from and disseminating data to not only a central hub but also to other terminals connected to that hub. Filing 137, Ex. 5 (Taylor affidavit) ¶ 11; Ex. 6 (Zweifel affidavit) ¶ 20.

Oklahoma City's Private Line retail group is further divided into teams that service Signature, Enterprise, and Alliance customers.  Filing 137, Ex. 5 (Taylor affidavit) ¶ 13.

- Private Line Signature teams service AT&T's largest retail service customers and, due to the volume of business from these customers, a team handles one specific client's orders.  Filing 137, Ex. 5 (Taylor affidavit) ¶ 14.

- Private Line Enterprise teams provide services to large retail service customers.  However, since the order volume from these customers is not as high as that generated by Signature customers, one DSM is assigned per account and that DSM may handle several different customers' accounts.  Filing 137, Ex. 5 (Taylor affidavit) ¶ 15.

- Private Line Alliance teams provide services to smaller AT&T retail service customers.  Due to the lack of order frequency from any individual customer, DSMs are not assigned to a specific client account, but rather to a "pool" of small customers.  One DSM within the team serves as the quality control manager for the team and prioritizes the orders, ensures the work is timely completed, and distributes the workload among the DSMs

14

on the team.  Filing 137, Ex. 5 (Taylor affidavit) ¶ 16.

2.   Data Frame Relay group:  Retail Clients (Oklahoma City and Omaha) and Wholesale Clients (Omaha only).

Frame Relay teams manage point-to-point connectivity for transmission of data to and from a central hub.  Filing 137, Ex. 5 (Taylor affidavit) ¶ 12; Ex. 6 (Zweifel affidavit) ¶ 21.  As with its Private Line group, Oklahoma City's Frame Relay group is further divided into teams that service Signature, Enterprise, and Alliance retail customers.  Filing 137, Ex. 5 (Taylor affidavit) ¶¶ 13-16.

3.   Data Local Prime group (Omaha only).

Local Prime teams handle orders requiring the implementation of circuits and local lines between AT&T, the Local Exchange ("LEC"), and the AT&T local customer.  Using the client criteria used to divide Oklahoma City's Frame Relay and Private Line teams for retail customers, Omaha's Local Prime group is further divided into teams that service Signature, Enterprise, and Alliance retail customers.  Filing 137, Ex. 6 (Zweifel affidavit) ¶¶ 23-26.

4.   Data Local UNEP group (Omaha only).

Local UNEP teams work with smaller AT&T clients, either in a pooled environment or as dedicated to numerous small clients, to set up and implement UNEP lines and circuits.  Based on the evidence before me, UNEP teams apparently coordinate pulling, moving, reinstalling, and reconnecting a business' data service lines when the business moves from one location to another.  One DSM on the UNEP team serves as the quality control manager for

15

the team to distribute the workload within the team.  Filing 137, Ex. 6 (Zweifel affidavit) ¶ 27-28.

    5.   Data Local Mac-D group (Omaha only).

Local Mac-D DSMs work in a pooled environment and handle orders to "Move, Add, Change, Disconnect," ("Mac-D") a service. Mac-D DSMs are not dedicated to specific types of services or specific clients.  They coordinate with AT&T and its customers concerning the ability of any new location to support the services requested by the customer and the timing of disconnection or services changes.  Filing 137, Ex. 6 (Zweifel affidavit) ¶¶  29-30.

    C.   <u>Specialized groups of VSMs and DSMs</u>.

There are also groups of VSMs and DSMs that handle, or for periods of time during the relevant time frame for this lawsuit, have handled highly specialized tasks for AT&T and/or its customers.  Examples include the following:

- A fifteen-member UMIU team investigated and resolved issues concerning billing errors, unbilled minutes, and billing discounts.  Once the cause of an error was identified, UMIU specialists advised area managers concerning whether a particular VSM created a billing problem by entering information incorrectly, and thereby notified the area manager concerning the need for additional training to avoid future problems. Filing 137, Ex. 25 (Kosloski deposition) at 26-27, 31-33.

- VSMs and DSMs designated as SOAs are subject matter experts with access to AT&T's mainframe.  They are assigned to the job of remedying and implementing real-time, and thus substantially unsupervised, corrections to billing problems.  Filing 137, Ex. 6 (Zweifel

16

affidavit) ¶ 43; Filing 137, Ex. 25 (Kosloski deposition) at 34-35.

- The Cap-N Transfer team manages large-scale transfers of billing information for large AT&T customers. Filing 137, Ex. 5 (Taylor affidavit) ¶ 29.

- A special UAT-Testing Team worked on testing new systems for AT&T to assess problems, develop guidelines, and suggest process improvements and training for persons working on the system.  Filing 137, Ex. 5 (Taylor affidavit) ¶ 29; Ex. 9 (Macall affidavit) ¶ 23.

- The TAC Pilot team was composed of a group of VSMs who participated in setting up and coordinating technical assistance calls on NODAL access orders.  Filing 137, Ex. 10 (Biggs affidavit) ¶ 9.

- Two VSMs were assigned to work on the ADL GSM program, which required these employees to learn new systems and take a new type of order from AT&T.  Filing 137, Ex. 10 (Biggs affidavit) ¶ 10.

## Job Tasks/Responsibilities Within the VSM and DSM Teams

The specific job tasks and level of responsibility accepted by DSMs and VSMs may vary based on the type of team they work on, their training and level of experience, the Area Manager assigned to the team, and the AT&T customer for whom they work.

VSMs and DSMs are trained to perform their jobs.  However, the training differs depending on the individual employee's assigned team.  If a VSM or DSM changes to a different type of work, for example from Data Private Line to Voice SPM or Mac-D, additional training is required.  The testimony reflects that except at a very superficial level, VSMs and DSMs cannot explain the purpose and work duties of teams other than their own, or how these teams internally manage their responsibilities and workload

17

to provide services for AT&T.  See e.g. Filing 137, Ex. 20
(Tuckson deposition) at 107-109; Ex. 21, (Edward Hendershott
deposition) at 51-52; Ex. 24. (Burns deposition) at 19-20; filing
155, Ex. D (Schramm deposition) at 12-13, 26-27; Ex. N (Allyson
Hendershott deposition) at 59; Ex. V. (Castro deposition) at 90.

DSMs generally receive four weeks of in-class training and
one week of floor training.  VSMs receive five to six weeks of
in-class training and one week of floor training.  This training
provides the basic framework for job performance, explains how to
follow West's procedures and use computer databases and programs
to research problems that arise, and provides information
regarding AT&T's products.  The classroom training, however, must
be supplemented by on-the-job training to address technical
service-specific and client-specific issues as they arise.
Filing 137, Ex. 5 (Taylor affidavit) ¶¶ 23-24; Ex. 6 (Zweifel
affidavit) ¶ 37; Ex. 7 (Davidson affidavit) ¶ 16-17; Ex. 13
(Johnson affidavit) ¶ 13; Ex. 23 (Kyhn deposition) at 19-22, 26-
29; Ex. 29 (King deposition) at 30-31, and attached ex. 7; filing
155, Ex. D (Schramm deposition) at 29-30; Ex. M (Kosloski
deposition) at 11-12).

Following training and a probationary period, newly hired
DSMs and VSMs are expected to independently process and implement
AT&T services with minimal supervisory involvement.  Filing 137,
Ex. 5 (Taylor affidavit) ¶ 27; Ex. 6 (Zweifel affidavit) ¶ 41;
Ex. 7 (Davidson affidavit) ¶ 20; Ex. 11 (Rahimi affidavit) ¶ 8.
However, the learning curve is steep and for new employees,
mistakes are likely; but repeatedly making the same mistakes and
being unable to resolve the same problems can lead to
termination.  Experienced team members are expected to mentor new
hires, assist each other in problem-solving, and suggest ideas

for improving the processes.  Filing 137, Ex. 8 (Ritonya affidavit) ¶ 9, 16; Ex. 10 (Biggs affidavit) ¶ 7; Ex. 11 (Rahimi affidavit) ¶ 9; filing 155, Ex. C (Schramm deposition) at p. 47; Ex. G (McConnaughhay deposition) at 38-40; Ex. V (Castro deposition) at p. 51.

Part of the training for DSMs and VSMs covers the multitude of procedures they must use to perform their job.  A procedure for resolving a specific problem may exist, and if so, VSMs and DSMs are required to implement that procedure to correct a problem.  Filing 155, Ex. S (Schwarz deposition) at 47-48. However, some issues arise that are not covered by any procedure. Filing 137, Ex. 13 (Johnson affidavit) ¶ 14; Ex. 17 (Schramm deposition) at p. 39-40.  On-the-job experience and training allows VSMs and DSMs to become increasingly familiar with and take more responsibility for implementing methods to resolve problems that arise.  Filing 137, Ex. G (McConnaughhay deposition) at 38-40.  While some VSMs and DSMs perform only the procedures as outlined by AT&T, others deviate from even established procedures in favor of a more efficient method of resolution.  Filing 137, Ex. 13 (Johnson affidavit) ¶ 14; filing 155, Ex. C (Schramm deposition) at p. 38-39; Ex. K (Parks deposition) at 8-9; Ex. O (King deposition) at 69-70; Ex. R (Palmer deposition) at p. 12-13.

Based on the evidence before me, the degree to which DSMs and VSMs act to resolve problems independently, and without management intervention, varies greatly.  Some immediately notify their Area Manager of any problems which may jeopardize the timely completion of a project and initiate no research or corrective action unless instructed to do so by management. Filing 137, Ex. 21 (Edward Hendershott deposition) at 44-45;

filing 155, Ex. I (Edward Hendershott deposition) at 57; Ex. L
(Mollman deposition) at 38-39, 42; Ex. U (Portwood deposition) at
p. 40-41.  Others identify the problem, notify management, and
await instruction on how to correct it.  Filing 155, Ex. J
(Thompson deposition) at 46-47.  Still others identify the
problem and determine how to solve it, but do not attempt to
correct it absent first receiving approval from the Area Manager.
Filing 155, Ex. T (Richardson deposition) at p. 37-38, 41-42.
Finally, some VSMs and DSMs identify the problem, determine
whether it is a priority and what course of action is required,
and then act to solve the problem themselves or seek assistance
from AT&T, a supervisor or, if needed, an escalation manager.
Filing 137, Ex. 13 (Johnson affidavit) ¶¶ 11-12; Ex. 19 (Castro
deposition) at 40-42; filing 155, Ex. N (Allyson Hendershott
deposition) at 89-91; Ex. P (Burns deposition) at 21-22; filing
163, Ex. 2 (Tuckson deposition) at 85-85.  Those who attempt to
find a solution to technical problems often rely on co-workers,
rather than management, because their team members have more
knowledge and expertise on service- or client-specific issues.
Filing 137, Ex. 24 (Burns deposition) at 18; filing 155, Ex. C
(Schramm deposition) at p. 43; filing 163, Ex. 2 (Tuckson
deposition) at 84-85.

     VSMs and DSMs are required to assess when an issue must be
"escalated" to a supervisor for resolution.  Filing 137, Ex. 5
(Taylor affidavit) ¶ 25; Ex. 6 (Zweifel affidavit) ¶ 39; Ex. 7
(Davidson affidavit) ¶ 17; Ex. 10 (Biggs affidavit) ¶ 3; Ex. 11
(Rahimi affidavit) ¶ 5; Ex. 12 (Fleming affidavit) ¶ 6; Ex. 13
(Johnson affidavit) ¶¶ 11-12; Filing 155, Ex. C (Schramm
deposition) at p. 9; Ex. N (Allyson Hendershott deposition) at
84-85, 89-90, 96.  Employees capable of seeking out solutions by
using resources both within and outside the team, and solving

20

complex problems independently without escalating the issues to
an Area Manager, receive positive remarks on performance
appraisals.  Filing 137, Ex. 8 (Ritonya affidavit) ¶ 15; Ex. 10
(Biggs affidavit) ¶¶ 5-6; Ex. 11 (Rahimi affidavit) ¶ 5; Filing
155, Ex. S (Schwarz deposition) at 54.  Those who do not are
counseled to improve, (filing 137, Ex. 10 (Biggs affidavit) ¶ 11;
Ex. 27 (Mollman deposition) at 62-63; filing 155, Ex. N (Allyson
Hendershott deposition) at 87-88), and if they fail to do so, are
not considered effective or efficient employees of West and are
subject to termination.  Filing 137, Ex. 8 (Ritonya affidavit) ¶
15; Ex. 11 (Rahimi affidavit) ¶ 8.

Some area managers assign discreet functions to members
within the team; for example, those with greater technical skill
are "order takers," and those who excel at customer service and
"people skills" are "order trackers."  However, other Area
Managers require the VSM or DSM to work the entire life cycle of
an order, with specific DSMs and VSMs designated as subject
matter experts for consultation if problems or challenges arise.
Filing 137,  Ex. 5 (Taylor affidavit) ¶¶ 20-21; Ex. 6 (Zweifel
affidavit) ¶¶ 34-35; Ex. 7 (Davidson affidavit) ¶¶ 13-14; Ex. 10
(Biggs affidavit) ¶ 8; Ex. 19 (Castro deposition) at 36; filing
155, Ex. V (Castro deposition) at 89-90.

VSMs and DSMs may have specialized roles within their
assigned team, such as facilitator, quality control manager,
subject matter expert, or UMIU (unbilled minutes) specialist,
depending on their expertise, the team itself, the area manager,
and the customer for whom they are managing the service.  Filing
137, Ex. 6 (Zweifel affidavit) ¶ 6; Ex. 7 (Davidson affidavit ¶
4; Ex. 10 (Biggs affidavit) ¶ 8; Ex. 17 (Schramm deposition) at
p. 37.  Some Area Managers expect every team member to be a

subject matter expert on some topic, to be a resource within the team for specific types of services or problems, and to lead team meetings on topics of developed expertise.  Filing 137, Ex. 10 (Biggs affidavit) ¶¶ 12-14; Ex. 11 (Rahimi affidavit) ¶ 10); Filing 137, Ex. 28 (Thompson deposition) at attached performance appraisal).  Some Area Managers appoint a VSM to be an "Area Manager in-charge," who is responsible for handling and/or escalating issues presented by teammates when the Area Manager is absent.  Filing 137, Ex. 10 (Biggs affidavit) ¶ 9.

Depending on the team's structure, purpose, and Area Manager, a VSM or DSM may be designated as the team's facilitator and tasked with receiving AT&T orders, verifying that the documentation provided is sufficient to process the order, assessing the respective workloads of team members, and distributing the order to teammates in a manner that promotes efficient processing.  Filing 137, Ex. 8 (Ritonya affidavit) ¶¶ 7-8, 14; Ex. 9 (Macall affidavit) ¶ 13; Ex. 13 (Johnson affidavit) ¶ 7; Ex. 20 (Tuckson deposition) at 23; Ex. 23 (Kyhn deposition) at 56-57.  A team facilitator may also be required to assist in preparing weekly reports for submission to AT&T which analyze the team's results, and which may include explaining any missed DMOQs ("denoted measures of quality").  Filing 137, Ex. 8 (Ritonya affidavit) ¶¶ 15; Ex. 9 (Macall affidavit) ¶ 13.  A facilitator may also prepare the Quality Control Management ("QCM") facilitator incoming report reflecting the distribution of orders and the daily reports of OTP ("on-time performance").  Filing 137, Ex. 9 (Macall affidavit) ¶ 13.  Facilitators ensure that team members carry out the requisite touchpoint procedures for client contact during the order's life cycle, handle technical or communication problems which may delay the progress of completing a service order (jeopardies; filing 155, Ex. C

22

(Schramm deposition) at p. 62), and keep the customer apprised throughout. Filing 137, Ex. 8 (Ritonya affidavit) ¶¶ 7-8. Facilitators also act as coaches and subject matter experts in assisting team members to resolve problems. Filing 137, Ex. 8 (Ritonya affidavit) ¶ 9; Ex. 9 (Macall affidavit) ¶¶ 13-14.

VSM and DSM duties with respect to customer contact and communication vary depending on the client served. For some clients, the VSM or DSM is required to actively participate in daily conference calls, prepare spreadsheets and document the status of projects for the client, prepare online databases for access by the client, and constantly communicate by e-mail or phone regarding the status of a project and any potential problems or issues. Filing 137, Ex. 5 (Taylor affidavit) ¶¶ 17-19; Ex. 6 (Zweifel affidavit) ¶¶ 31-32, 40; Ex. 7 (Davidson affidavit) ¶¶ 10-11; Ex. 12 (Fleming affidavit) ¶ 26. In some circumstances and for some clients, if a question arises concerning whether the order reflected is really what the customer wants, the VSMs and DSMs contact the customer directly to seek confirmation or clarification. Filing 137, Ex. 19 (Castro deposition) at 33-34, 36-39; filing 155; Ex. V (Castro deposition) at 62 (assigned to a "high maintenance" Marriott team). However, other VSMs and DSMs never speak with their assigned AT&T customer. Filing 137, Ex. 21 (Edward Hendershott deposition) at 51-52 (handling General Electric account and later part of a CAP-N team).

Involvement with the client is also dependent on the level of reliance and trust that has developed between the client and DSM or VSM who manages their orders, and the DSM's or VSM's level of experience and competence. Filing 137, Ex. 5 (Taylor affidavit) ¶ 26; Ex. 6 (Zweifel affidavit) ¶ 33, 40; Ex. 7

23

(Davidson affidavit) ¶ 12, 19.   Some AT&T customers rely on their assigned DSM or VSM to such an extent that they seek out and receive advice from the DSM or VSM concerning what AT&T services to order for their company's goals and expectations, and then place an order for AT&T services.   Filing 137, Ex. 12 (Fleming affidavit) ¶ 26; Ex. 13 (Johnson affidavit) ¶ 9 (assigned to George Weston).   However, other DSMs and VSMs do not suggest products or alternatives to AT&T customers, nor do they suggest that a service other than the one ordered would better serve the customer's goals.   Filing 137, Ex. 21 (Edward Hendershott deposition) at 66 (assigned to client with its own telecom coordinators–never suggests anything); Ex. P (Burns deposition) at 22-23, 33 (refers customer's potential order changes to sales); Ex. Q (Kowalke deposition) at 85; Ex. T (Richardson deposition) at p. 29-30 (refers incorrect orders to Area Manager); Ex. U (Portwood deposition) at p. 11-12.

<u>LEGAL ANALYSIS</u>

King, as the named plaintiff, seeks to bring this suit under 29 U.S.C. § 216(b).   Section 216(b) provides:

An action to recovery the liability prescribed [under the FLSA] may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.   No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).   Unlike Rule 23 of the Federal Rules of Civil Procedure, which require class members to either "opt out" of the class action lawsuit or be bound by the outcome, a "class" member under § 216(b) must "opt in" to be bound.

There is a fundamental, irreconcilable difference
between the class action described by Rule 23 and that
provided for by FLSA § 16(b).  In a Rule 23 proceeding
a class is described; if the action is maintainable as
a class action, each person within the description is
considered to be a class member and, as such, is bound
by judgment, whether favorable or unfavorable, unless
he has 'opted out' of the suit.  Under § 16(b) of FLSA,
on the other hand, no person can become a party
plaintiff and no person will be bound by or may benefit
from judgment unless he has affirmatively 'opted into'
the class; that is, given his written, filed consent.

Schmidt v. Fuller Brush Co., 527 F.2d 532, 536 (8th Cir. 1975).
Since employees must opt into a class seeking FLSA recovery, FLSA
class actions proceedings are often called collective actions.

The FLSA collective-action mechanism is a two-step process.[6]
The first step allows employees to obtain "conditional
certification" of a collective action by showing the court that
the plaintiffs and those they seek to represent are "similarly
situated."  Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208,
1218 (11th Cir. 2001).  Based on a limited record, often only the
pleadings and perhaps affidavits, the court must initially

---

[6] The alternative to this two-step test is the Rule 23 class
action analysis wherein the court evaluates numerosity,
commonality, typicality, and adequacy of representation in
decided where a class should be certified.  Freeman v. Wal-Mart
Stores, Inc., 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003)(citing
Shushan v. University of Colorado, 132 F.R.D. 263 (D. Colo.
1990)).  The Eighth Circuit has not specifically decided whether
the two-step approach or the requirements of Rule 23 must be
applied when determining certification under § 216(b).  However,
courts have uniformly held that the Rule 23 factors for "opt out"
class actions are inapplicable to the FLSA's "opt in" class
certification process.  Bartleson v. Winnebago Industries, Inc.,
2003 WL 22427817, *4 (N.D. Iowa 2003)(collecting cases).
Moreover, I need not determine which test is correct.  As noted
in Freeman, "[w]hatever test is employed, the relevant inquiry is
whether the members of the proposed class are similarly
situated."  Freeman, 256 F. Supp. 2d at 945.

determine whether there are "other employees of the
defendant-employer who desire to "opt-in' and are 'similarly
situated' [to the named plaintiff] with respect to their job
requirements and with regard to their pay provisions." Dybach v.
State of Fla. Dept. of Corrections, 942 F.2d 1562, 1567 (11th
Cir. 1991).  See also Dietrich v. Liberty Square, L.L.C., 230
F.R.D. 574, 577 (N.D. Iowa 2005).  Although the standard for
satisfying this first step is lenient, the court still requires
at least substantial allegations that the putative class members
were together victims of a single decision, policy or plan
infected by discrimination.  "[W]hile a united policy, plan or
scheme of discrimination may not be required to satisfy the more
liberal similarly situated requirement [of the first step], some
identifiable facts or legal nexus must bind the claims so that
hearing the cases together promotes judicial efficiency." Barron
v. Henry County School System, 242 F. Supp. 2d 1096, 1103 (M.D.
Ala. 2003).

        If the court concludes a FLSA proposed class should be
conditionally certified, it may give notice, or permit notice to
be given to potential class members, and it may grant discovery
requests aimed at identifying potential class members.
Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 165
(1989)(collective action seeking relief under the ADEA, which
incorporates the FLSA opt-in requirements of 29 U.S.C. § 216(b));
Dybach, 942 F.2d 1562, 1567 (11th Cir. 1991).  See also Campbell
v. Amana Company, L.P., 2001 WL 34152094, *3 (N.D. Iowa 2001)
(denying plaintiff's motion for conditional class certification
under § 216(b) in an ADEA action pending receipt of additional
discovery); Severtson v. Phillips Beverage Co., 137 F.R.D. 264,
*267 (D. Minn. 1991)(requiring a showing of some factual basis
for the § 216(b) request for conditional class certification, in

the absence of which the magistrate judge's order compelling
discovery of the names and addresses of all persons who fall
within the plaintiffs' proposed class definition must be
reversed).

This court has never conditionally certified a class in this
case, and was never required to analyze the "similarly situated"
requirement at the initial notice stage of these proceedings.
The parties reached an agreement whereby West allowed notice of
the claim to be sent to all VSMs and DSMs employed during the
relevant period while preserving its right to later challenge the
propriety of proceeding as a class.  Filing 137, Ex. 3 (Report of
Parties' Planning Conference) at p. 6 ¶ 4.  Thereafter, the
parties pursued this litigation for the last 18 months as if a
class had been conditionally certified.

The discovery is now complete, or nearing completion, and
the parties' pending motions require the court to determine
whether a class should be certified.  The pending motions
therefore relate to the second step in the § 216 certification
process.  At the second stage, with discovery available to the
parties for submission in support of or opposing the proposed
class, the court evaluates whether the named plaintiff and the
plaintiffs who have opted into the lawsuit are "similarly
situated," and it considers evidence concerning the background of
the plaintiff and the potential "opt-in" employees, and the
management and employment structure of the defendant.  Since the
court has substantial information upon which to base its
decision, a stricter standard of proof is applied at the second
step in deciding whether the opt-in plaintiffs are "similarly
situated" for the purposes of pursuing an FLSA action.  Hipp, 252
F.3d 1208, 1218 (11th 2001)(citing Mooney v. Aramco Services Co.,

27

54 F.3d 1207, 1213 (5th Cir. 1995)); <u>Freeman v. Wal-Mart Stores, Inc.</u>, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

The plaintiff bears the burden of proving that he and the putative members of the prospective FLSA class are similarly situated. <u>England v. New Century Financial Corp.</u>, 370 F. Supp. 2d 504, 507 (M.D. La. 2005); <u>Holt v. Rite Aid Corp.</u>, 333 F. Supp. 2d 1265, 1270 (M.D. Ala. 2004); <u>Freeman</u>, 256 F. Supp. 2d at 945 (citing <u>Grayson v. K Mart Corp.</u>, 79 F.3d 1086, 1096 (11th Cir. 1996). Similarly situated does not necessarily mean identically situated. <u>England</u>, 370 F. Supp. 2d at 507. However, there must be some demonstrated similarity among the individual circumstances "which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice." <u>England</u>, 370 F. Supp. 2d at 507. Merely showing that the employer classified a group of employees as exempt is not sufficient to establish that these employees are similarly situated for the purposes of an FLSA collective action. <u>Holt</u>, 333 F. Supp. 2d at 1270; <u>Freeman</u>, 256 F. Supp. 2d at 945; <u>Morisky v. Public Service Elec. and Gas Co.</u>, 111 F. Supp. 2d 493, 498 (D.N.J. 2000)(defendants' alleged "common scheme" to deny overtime to proposed class members did not bind the class such that all plaintiffs were considered "similarly situated").

King asserts that West failed to pay VSMs and DSMs overtime compensation for hours worked in excess of forty per week, misclassified them as exempt "administrative" employees under the relevant law when in fact they are non-exempt workers. Therefore, he and members of the proposed "opt-in" class claim entitlement to overtime compensation.

In assessing whether the VSMs and DSMs are similarly situated for the purposes of pursuing a claim for unpaid overtime, the court examines the similar and disparate factual and employment settings of the individual plaintiffs; the various defenses available to the defendant which appear to be either class-wide or individual to each plaintiff; and fairness and procedural considerations that would make certification either proper or improper.  England, 370 F. Supp. 2d at 509-510 (M.D. La. 2005); Frank v. Gold'n Plump Poultry, Inc., 2005 WL 2240336, *2 (D. Minn. 2005); Basco v. Wal-Mart Stores, Inc., 2004 WL 1497709, *4 (E.D. La. 2004)(citing Mooney, 54 F.3d at 1213 n. 7 (ADEA case applying § 216 and citing Lusardi v. Xerox Corp., 118 F.R.D. 351, 359 (D.N.J. 1987)(ADEA case) and Thiesen v. General Electric Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001)(ADEA case)).

Based on the foregoing criteria, I conclude DSMs and VSMs are not similarly situated such that they may proceed as a class to recover unpaid overtime.  Determining whether employees are properly deemed "exempt" under the FLSA requires "an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria." Morisky, 111 F. Supp. 2d at 498.  See also Holt, 333 F. Supp. 2d at 1271-72. Since the ultimate issue to be determined in this case is whether West properly classified VSMs and DSMs as exempt, deciding whether members of this proposed class are "similarly situated" requires analyzing the nature of the job duties performed by each putative plaintiff.  Holt, 333 F. Supp. 2d at 1271-72 (citing Morisky, 111 F. Supp. 2d at 498).

The members of the proposed opt-in class have the same job title, and essentially the same job description.  However,

29

employees with the same job title are not "similarly situated"
for the purposes of an "opt-in" FLSA class if their day-to-day
job duties vary substantially.  Morisky, 111 F. Supp. 2d at 495,
499 n. 8 ("Technical Analysts" for the defendant were not
similarly situated where one was assigned to operations, one to
maintenance, and one quality assurance, and accordingly, the
focus of their work differed); Tumminello v. U.S., 14 Cl. Ct.
693, 696 (1988)("employees within the Defense Mapping Agency of
similar grade (GS-11) and job category (Electronics Technician)"
were not similarly situated where they were employed in different
federal agencies and in various job categories).

VSMs and DSMs are assigned to many different teams which
work on orders for distinct services for different types of
clients and with different Area Mangers.  They do not uniformly
perform the same type of work or exercise the same amount of
discretion.  Some are assigned to positions which require them to
exercise substantially more discretion and independent decision-
making than most other VSMs and DSMs on a daily basis, e.g.
facilitators, subject matter experts, and members of specialized
teams such as the UMIU and SOA teams.  Others serve the role as
"Area Manager-in-charge" on some days but not others, or were
members of specialized teams, with highly specialized tasks, for
only a part of the relevant time period at issue in this case.
Some VSMs and DSMs are assigned to teams and work for clients and
Area Managers that require the employee to actively problem-
solve, provide suggestions to AT&T customers, and maintain
individual client contacts on a daily basis.  The degree to which
VSMs and DSMs carry on such functions varies on an individual
basis, and that variation may affect whether they were properly
considered "exempt."  "[T]he exempt or non-exempt status of any
particular employee must be determined on the basis of whether

30

his duties, responsibilities and salary meet all the requirements of the appropriate section of the regulations····" 29 C.F.R. § 542.201(b)(2).

Opt-in plaintiffs performing different jobs who are subject to different job actions with various decisions by different supervisors made on a decentralized employee-by-employee or team-by-team basis are not appropriate for class treatment. <u>Koren v. SUPERVALU, Inc</u>., 2003 WL 1572002, *16 (D. Minn. 2003). The differences among VSMs and DSMs in terms of managers, team policies and philosophies, client interactions, and factual situations overwhelmingly predominate over their similarities and will require individual inquiry at trial. <u>England</u>, 370 F. Supp. 2d at 511 (refusing even conditional certification of an FLSA collective action for unpaid overtime where the proposed class was composed on different store managers from different localities who operated under different local policies); <u>Holt</u>, 333 F. Supp.2d at 1274 (variations in evidence concerning amount of time spent running a cash register, stocking shelves, making signs, etc. versus managing the retail store defeated any claim that the day-to-day tasks of store managers and assistant managers were sufficiently similar to designate a class for the purposes of deciding if they were properly designated as exempt); <u>Basco</u>, 2004 WL 1497709, *8 (a case to recover unpaid overtime should not be even conditionally certified where the potential opt-in plaintiffs "performed different jobs at different geographic locations and were subject to different managerial requirements which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis"); <u>Clausman v. Nortel Networks, Inc</u>., 2003 WL 21314065, *5 (S.D. Ind. 2003)(where members of defendant's sale staff performed their

duties in a variety of ways with respect to customer contact and time spent away from the office depending on the sales group to which they were assigned, individual inquiry was necessary to determine whether each was properly classified under the FLSA).

The individual job disparities among VSMs and DSMs also give rise to the individualized defenses West may raise in this case--including case-by-case examinations of whether the employees truly worked "off-the-clock" and at home as some allege, whether such work would fall within a de minimus exemption under the FLSA, whether the employee actually worked more than forty hours a week, or whether he or she accepted the benefits of scheduling flexibility (arriving late, taking comp time later, etc.) afforded by some managers to salaried employees.  Disparate individual defenses heighten the individuality of claims, and requiring the defendant to raise these arguments in a class action suit undermines its ability to mount a clear and coherent defense to the case and significantly complicates trial management.  <u>Mooney</u>, 54 F.3d 1213 n. 7; <u>Basco</u>, 2004 WL 1497709, *8 .

Because the jobs and job responsibilities prevent application of class-wide claims or defenses, litigating this case as a collective action would not be efficient.  The exempt or non-exempt status of 177 opt-in plaintiffs would need to be determined on a job-by-job, or an employee-by-employee basis, resulting in essentially individual trials, even if a class were certified.  The necessity of such individualized inquiries renders class certification improper in this case.

32

Since I conclude that class certification should be denied, I need not address whether the class should be divided into an Omaha and an Oklahoma City subclass.

The plaintiff has also moved to transfer the claims of defendant's Oklahoma City employees to the United States District court for the District of Oklahoma.  Though the plaintiff is a resident of Oklahoma and worked at the defendant's Oklahoma City location, (see filing 1 (complaint) ¶ 2), the plaintiff chose to file his suit and litigate his claim in the United States District Court for the District of Nebraska.  The plaintiff acknowledges that this case could have been initially filed in the United States District Court for the District of Oklahoma. Filing 132 (plaintiff's brief) at p. 8.

The plaintiff requests transfer of the case to Oklahoma in the interest of judicial economy and fairness and for the convenience of the parties and the witnesses.  While that argument may have been meritorious had 103 Oklahoma City employees been added as class plaintiffs, it lacks merit under the current posture of this case.

The plaintiff further requests bifurcation of the liability and damage phases of the trial.  Under Rule 42(b) of the Federal Rules, the court, "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue . . ."  F.R.C.P 42(b).  Accordingly, a party seeking severance has the burden of proving that separate trials will (1) promote convenience, (2) expedite the proceedings, or (3) avoid unfair prejudice to a party.

33

In the absence of a certified class, there is no justification for bifurcating the plaintiff's FLSA trial against West for recovery unpaid overtime.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b) that:

1.   The defendant's Motion to Reject Certification of Collective Action, filing 135, be granted; and

2.   The plaintiff's Motion for Limited Decertification and Transfer, and Motion for Bifurcation of Trial, filing 131, be denied.

The parties are notified that a failure to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

DATED this 13th day of January, 2006.

BY THE COURT:

s/ *David L. Piester*
David L. Piester
United States Magistrate Judge